Deborah Lisa WILLIAMS *v.*
James Sloan WILLIAMS

CA 83-250                            671 S.W.2d 201

Court of Appeals of Arkansas
En Banc
Opinion delivered June 27, 1984

*Richard L. Walloch,* for appellant.

*Moody & Nye,* by: *Edward O. Moody,* for appellee.

MELVIN MAYFIELD, Chief Judge. Deborah Lisa Williams appeals from a decree of divorce granted James Sloan Williams and from the court's order of split custody of their two minor children.

Debby and Jim were married in March of 1979, when he was in the Marine Corps stationed in California. They lived there until he got out of the Marines in February of 1981 at which time they moved to Arkansas, his home state. Debby is of Chinese ancestry but was born and raised in this country. She had been married before and has a child by that marriage. She and James have two children.

There is evidence to indicate that Debby did not like Arkansas; that she began corresponding with her ex-husband, Chuck; and that she was making plans to leave Jim and return to Chuck. One day her mother arrived here from California and Debby moved out of the house she shared with Jim, and announced she was going back with her mother to California to live. Jim filed suit for divorce that same day. Debby filed a counterclaim in which she asked for divorce and on August 10, 1982, the case was tried.

Jim was granted divorce on the grounds of general indignities. He testified that Debby had accused him numerous times of being unfaithful, had called him a bastard in front of the children, and was engaged in a long distance love affair with her ex-husband. (She admitted that during the short time she had lived in Arkansas, she had gone back to California at least one time and had seen Chuck while she was there.) Jim's testimony was corroborated by a woman who said she was a friend of both of the Williams. She testified she had heard Debby accuse Jim of being with other women, had known Debby was corresponding with her ex-husband, and that Debby was planning to remarry him as soon as she could get back to California.

In short, we think there was sufficient evidence of indignities, independently corroborated, to sustain the finding of the trial court that Jim had met his burden of proof as required by such cases as *Anderson* v. *Anderson*, 269 Ark. 751, 600 S.W.2d 438 (Ark. App. 1980). We do not reverse

the chancellor's findings of fact unless they are clearly wrong, ARCP Rule 52(a), and we cannot say he erred in granting the divorce to Jim. Parenthetically, the evidence would have sustained the granting of the divorce to Debby had the chancellor made that decision.

At the time of the trial in August of 1982, one of the parties' children was a year old and one was two years old. The court held that Debby could have custody of them for six months and Jim could have custody for six months. Recently, in *Hansen* v. *Hansen*, 11 Ark. App. 104, 666 S.W.2d 726 (1984), this court said:

> The law pertaining to joint or divided custody is now well settled in this state. Although equally divided custody of minor children is not generally favored, it may be ordered where the circumstances clearly warrant it. The paramount issue in all custody cases is the welfare and best interest of the child. If it is shown that the interest of the child is better fostered by divided custody we have held that this is a proper order for a court to make. *Drewry* v. *Drewry*, 3 Ark. App. 97, 622 S.W.2d 206 (1981).

In the instant case, it might be said that the evidence does not show that it would be in the best interest of the children for either of the parents to have custody of them. Jim had been disciplined in the military for smoking marijuana and he had been AWOL. He also admitted he had been in possession of certain drugs (Tylenol, he said) and hypodermic needles and syringes which had been stolen from a doctor's office; and that he had offered marijuana to the daughter of his corroborating witness. However, he said he no longer used drugs or alcohol and had not for about a year.

On the other hand, Jim said that Debby did not take good care of the children. He said she didn't bathe them or feed them properly, giving them only fruit, cheese, yogurt and chicken — not meat and potatoes that would stick to their ribs — and that sometimes she let them run around in diapers. Debby testified that she was living in California

with her mother; that she was willing to split custody with Jim although she would rather have the children herself; and that she might remarry her ex-husband, Chuck, who was with her at the trial. She testified that she had no job, had not finished high school, and lived off her mother and a $500 per month government allotment she got for her oldest child because Chuck was still in the service.

In *Hansen* we said that, unlike *Drewry*, the child in *Hansen* had two homes in different states; that she would be subjected to "the emotional and psychological trauma of adjusting to one parent and experiencing the abrupt severance of that relationship by a sudden change in custody and environment to another parent." Much of what we said in *Hansen* applies here. Of course, in this case the chancellor did not have a perfect choice. These children are actually going to live with grandparents most of the time. Jim admits his parents keep the children when he has their custody, and Debby's mother will keep the children if Debby works while they are in her custody. The children are now two and four years old. Undoubtedly the chancellor will be called upon in the next couple of years to make a new decision about the children's custody. By then his choice may be clear, based on past experience and changes in circumstances.

In *Calhoun v. Calhoun*, 3 Ark. App. 270, 625 S.W.2d 545 (1981), we said, "We know of no case in which the superior position, ability and opportunity of the chancellor to observe the parties carry as great a weight as one involving minor children." We cannot say that the chancellor was clearly wrong in this finding in regard to the custody of the children in the case at bar.

One other point needs to be noticed. After the trial on August 10, 1982, Debby's attorney filed a motion for a new trial alleging that the chancellor, at the temporary custody hearing in October of 1981, had referred to Debby as a foreigner and that this statement indicated a prejudice toward her and a new trial should be granted for that reason. The judge denied the motion and on the authority of *Harrison v. The State*, 35 Ark. 458 (1880), found the attorney in contempt and fined him $100.00. The attorney asserts in

the brief he has filed for the appellant Debby Williams that the chancellor was in error in the contempt matter. Suffice it to say, that matter is not before us. The attorney is not a party to this case, and the notice of appeal does not mention the contempt matter. Moreover, the proper remedy for relief from an order of contempt is by certiorari and not by appeal. *Johnson* v. *Johnson*, 243 Ark. 656, 421 S.W.2d 605 (1967); *Beene* v. *The State*, 22 Ark. 149 (1860).

The decree appealed from is affirmed.

CRACRAFT and CLONINGER, JJ., dissent.

GEORGE K. CRACRAFT, Judge, dissenting. For even stronger reasons than I voiced on behalf of the court in *Hansen*, I respectfully dissent. In *Drewry* we affirmed a chancellor's finding that a child's best interest could be fostered while in split custody. There the parents were in full accord as to how the child was to be raised and they lived in the same neighborhood. The only effect of that order was to change the child's principal place of abode biannually. In *Hansen* we reversed such a finding where there was parental discord as to the raising of the child, the parents lived in different states, and divided custody would require the child to adjust to two environments, schools, diets and disciplinary rules every three months.

Here we are affirming such an award where the situation is much worse and more detrimental to the children than in *Hansen*. Here there is not only discord between the parents, but the primary care of the children will be left to two sets of grandparents in two homes over 2,000 miles apart. For six months they will be required to adjust to an urban California environment and then to readjust to a rural Arkansas one the following six months. They must adjust to the discipline, diet and environment of an oriental culture and then readjust to an occidental one. The emotional and psychological trauma to which this subjects the children cannot be erased by a reevaluation of the situation on a change of circumstances several years hence, as the majority suggests. The children need to develop a sense of "belonging" in one or the other of these

two worlds and "visiting" in the other. Although the choices presented to the chancellor were less than desirable, in my opinion, a wrong choice of principal custodian would be preferable to the dilemma in which we have placed these children.

I am authorized to state that Cloninger, J., concurs with these views and joins in this dissent.